# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **RAMON BLANCO, individually and on** | : | **Case No. 1:04CV230** |
| **behalf of all those similarly situated** | : | |
| **Plaintiff,** | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | <u>**OPINION AND ORDER**</u> |
| **KEY BANK USA, N.A., JP MORGAN** | : | |
| **CHASE BANK, AND BANK ONE** | : | |
| **NATIONAL BANKING ASSOCIATION** | : | |
| **Defendants.** | : | |


Before the Court are Key Bank USA, N.A. ("KeyBank") , J.P. Morgan Chase Bank

("Chase"), and Bank One National Banking Association's (collectively "defendants") joint

*Motion to Dismiss Plaintiff's Third Amended Class Action Complaint* (Doc. 104) and plaintiff

Ramon Blanco's ("Blanco" or "plaintiff") *Amended Motion for Class Certification* (Doc. 111).

In their motion to dismiss, defendants seek to dismiss plaintiff's two-count complaint under

Federal Rule of Civil Procedure 12(b)(6) for failure to state a claims for violations of the federal

Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. ("TILA") or for violations of Ohio's Retail

Installment Sales Act, Ohio Revised Code § 1317.01 *et seq*. ("RISA").  Plaintiff's motion for

class certification seeks to certify two groups of plaintiffs: a TILA subclass, and a RISA subclass.

On December 28, 2005, the clerk of courts reassigned this case to the undersigned after

Judge James S. Gwin's recusal.[1]  On March 10, 2006, defendants filed a *Motion to Dismiss*

*Plaintiff's Third Amended Class Action Complaint* (Doc. 104).  On April 10, 2006, plaintiff filed

---

[1] On September 30, 2005, Judge Gwin denied the defendants' motion to dismiss in this
case.  <u>Blanco v. KeyBank USA, N.A.</u>, No. 04-cv-230, Slip op., 2005 WL 4135013 (N.D.
Ohio Sep. 30, 2005).  On December 28, 2005, however, Judge Gwin recused himself
from the matter and vacated his prior ruling.  <u>Blanco v. KeyBank USA, N.A.</u>, No. 04-cv-
230, Slip op., 2005 WL 5789023 (N.D. Ohio Dec. 28, 2005).

his *Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Third Amended and Supplemental Complaint* (Doc. 110).  Defendants' filed a *Reply Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Third Amended Class Action Complaint* on April 19, 2006 (Doc. 114).  Because critical aspects of the parties dispute were under consideration by the Supreme Court in <u>Watters v. Wachovia Bank, N.A.</u>, --- U.S. ----, 127 S.Ct. 1559 (2007), a case which, like the instant matter, turned on federal preemption under the National Bank Act (the "NBA"), the Court stayed its resolution of the pending motion. Ultimately, the Court termed the Motion to Dismiss in February, 2007 to allow for supplemental briefing in the face of the Supreme Court's decision in <u>Watters</u>.  The parties have since submitted their supplemental memoranda in light of the Supreme Court's decision, and the matter is ripe for the Court.  For the reasons explained more fully below, the defendants' Motion to Dismiss (Doc. 104) is **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part.  Plaintiffs' *Amended Motion for Class Certification* (Doc. 111) is **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part.

## I.    BACKGROUND

For purposes of the motion to dismiss, the Court assumes as true the factual allegations in plaintiff's Third Amended and Supplemental Class Action Complaint and Demand for Jury Trial (the "Complaint") (Doc. 98).

According to the Complaint, plaintiff Ramon Blanco, a Florida resident, enrolled in a computer and technical training program offered by The Academy of Weston, Inc. ("Weston").  In September, 2002, Blanco entered into a Student Enrollment Contract with Weston which included certain financial terms and disclosures relating to his student loan.  Plaintiff's complaint alleges that Defendant KeyBank solicited, arranged, and offered financing for his student loan under the Student

2

Loan Contract through its agent at The Academy Schools.[2]  KeyBank provided Blanco with a Truth in Lending Act Disclosure Statement, and Blanco executed a promissory note in favor of KeyBank. Prior to the beginning of classes, KeyBank made full payment to The Academy Schools for the amount of Blanco's tuition.

According to Blanco, KeyBank received full value for loans made to Academy students by selling them via an asset-backed securitization as part of a group of loans that eventually became the KeyCorp Student Loan Trust 2002-A (the "Trust").  Currently, KeyBank only services the loans. J. Chase and Bank One, as trustees of the Trust, hold the notes.[3]

Blanco further alleges that, due to The Academy of Weston's closing in 2003, he did not receive the training, certification, or other benefits promised to him as part of his matriculation. Blanco claims to have presented, or made a reasonable effort to present, claims for recoupment or discharge of the promissory notes to The Academy of Weston; but, due to its closing, no action was taken.  KeyBank has not discharged Blanco from his payment obligations under the promissory note.

Blanco's TILA and RISA claims arise from: (1) KeyBank's alleged failure to accurately disclose the particular index to which the loans' annual interest rate is tied (the TILA claim); and (2) their contention that, due to The Academy of Weston's failure to provide benefits (*i.e.*, training), because the defendants are holders of purchase money installment loans, Blanco is entitled to recover any payments made to the defendants and to discharge his obligation to make any future payments (the RISA claim).

---

[2] According to the Complaint, The Academy of Weston, The Academy of West Palm Beach, Inc., The Academy of Ft. Lauderdale, Inc., The Academy of Tampa, Inc., and the Academy of Kendall, Inc., collectively referred to as "The Academy Schools," shared common ownership.

[3] In mid-2004, Chase and Bank One merged.

3

## II.     LEGAL STANDARD

The defendants have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Blanco has failed to state a claim for relief under TILA or RISA.  When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a district court, "must construe the complaint in the light most favorable to plaintiffs [and] accept all well-pled factual allegations as true."  League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007).

"Although this is a liberal pleading standard, it requires more than the bare assertion of legal conclusions.  Rather, the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory."  Southeast Texas Inns, Inc. v. Prime Hospitality Corp., 462 F.3d 666, 671 (6th Cir. 2006).  "In the aftermath of the Supreme Court's recent decision in Bell Atlantic v. Twombly, 127 S.Ct 1955 (2007), [the Sixth Circuit has] explained that a plaintiff's allegations, while 'assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief.'"  B&V Distrib. Co., Inc. v. Dottore Cos., LLC, No. 06-3839, Slip. op., 2008 WL 2080304, at *3 (6th Cir. May 15, 2008) (emphasis in original) (quoting Bredesen, 500 F.3d 523, 527).  Further, a court "need not accept as true legal conclusions or unwarranted factual inferences."  Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) (citations omitted).

## III.    DEFENDANTS' MOTION TO DISMISS

As noted above, Blanco has raised two claims in his complaint, individually and on behalf of a putative class.  Blanco's first claim, brought against KeyBank, is for violations of the federal Truth in Lending Act.  Blanco's second claim, against KeyBank, Chase, and Bank One, arises under Ohio's Retail Installment Sales Act.  According to Blanco, under certain circumstances, RISA

4

permits purchasers to assert the various defenses they would have against a seller (here, The Academy of Weston) as affirmative claims against holders of the notes (Chase and Bank One).

### A.    Plaintiff's Claim for Relief Under TILA.

When considering the parties' arguments with respect to the TILA claim, the Court is mindful that, "TILA is a remedial statute and, therefore, should be given a broad, liberal construction in favor of the consumer." Begala v. PNC Bank, Ohio, N.A., 163 F.3d 948, 950 (6th Cir. 1998) ("The Truth in Lending Act . . . was enacted to promote the informed use of credit by consumers by requiring meaningful disclosure of credit terms."). The Federal Reserve Board's (the "Board") interpretations of Regulation Z, moreover, are to be afforded wide latitude. Indeed, "absent some obvious repugnance to the statute, the Board's regulation implementing this legislation should be accepted by the courts, as should the Board's interpretation of its own regulation." Anderson Bros. Ford v. Valencia, 452 U.S. 205, 219 (1981); see also Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565 (1980) ("Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive for several reasons.")

In count one of the Complaint, plaintiff alleges that KeyBank failed to make the disclosures required by TILA and Regulation Z.[4] Plaintiff alleges that, in violation of 15 U.S.C. § 1638(a)(4) and 12 C.F.R. §' 226.18(e) & (I), KeyBank failed to accurately disclose the annual percentage rate (the "APR") for the student loan, and failed to accurately disclose how that APR could vary. Specifically, according to the plaintiff, KeyBank failed to satisfy its obligation to specify, in the

---

[4] 12 C.F.R. § 226, issued by the Board to implement the Truth in Lending Act, is commonly referred to as "Regulation Z."

"federal box," the particular index to which the loan's APR was tied.[5]  Instead, the federal box

provided by KeyBank merely states that the index is the London Interbank Offered Rate ("LIBOR").

According to the plaintiff, however, there are at least four LIBOR indices – one month, three month,

six month, and twelve month.  Plaintiff believes that this ambiguity renders the disclosure inaccurate,

or, at a minimum, unclear.   As a result, plaintiff seeks damages pursuant to 15 U.S.C. §

1640(a)(2)(B).

In sum, Plaintiff contends that Regulation Z requires KeyBank to disclose "the circumstances

under which the rate may increase." 12 C.F.R. § 226.18(f)(1)(i).  Where, as here, there is a variable

interest rate, "the circumstances under which the rate may increase *include identification of any index

to which the rate is tied,* as well as any conditions or events on which the increase is contingent."

Id., Supp. I, Official Staff Interpretation, Subpart C – Closed End Credit, ¶ 226.18(f)(1)(i)1

(emphasis added).  In short, according to plaintiff, *full* disclosure requires the index to which the rate

is tied to be named in the Federal Box.

Defendants argue that their federal box disclosure complies with both the letter and the spirit

of TILA.  Defendants claim that their "disclosure goes far beyond the statutory and regulatory

requirements."  (Doc. 104, at 4.)  KeyBank argues that it: (1) identified LIBOR in the TILA

Disclosure Statement as the specific index to which the annual percentage rate is tied; and (2)

supplied information regarding the interest rate in the promissory note given simultaneously to

Blanco with the Disclosure Statement – including the fact that the three-month LIBOR rate applied.

See Plaintiff's Ex. 2 ¶ D(4).  Essentially, KeyBank concedes that the Federal Box on the loan

---

[5] Certain key, credit-related disclosures generally are required by Regulation Z to be
segregated from the other terms of a loan agreement on a separate sheet of paper or set off
from other information by bold, divided, print lines often referred to as a "federal box."

documents did not provide the specific LIBOR index to which the rate was tied, but argues that, because the rate was disclosed within the promissory note, it complied with the Act.

Keybank also contends that some of the TILA Model Forms provided by the Board do not mention an index.  KeyBank argues that three of the four Model Forms (that serve as examples of federal box disclosures) addressing variable rates found in the appendices to 12 C.F.R. §226 do not even mention an index.  Thus, according to KeyBank, the failure to provide the specific LIBOR index is not actionable – indeed, according to KeyBank, they were under no obligation to even mention LIBOR generally.  (See Doc. 104, at 4 (referencing 12 C.F.R. §226, Appendices H-3, H-4A, H4-B, and H4-C).).  KeyBank argues that, though it chose not to use a model form, because it could have used a model form that supplied less information, it should be entitled to the same safe harbor it would have received had it chosen to use a model form.  (See Doc. 114, at 3 (citing 15 U.S.C. §§ 1604(b), 1640(f); Cirone-Shadow v. union Nissan of Waukegan, 955 F. Supp. 938, 944 (N.D. Ill. 1997) (holding that compliance with a TILA model form bars claims regarding the form of the statement))).  The Court finds KeyBank's arguments to be unpersuasive.

### 1. The Specific LIBOR Index Should Have Been Disclosed.

KeyBank's first argument, that it identified the index to which the rate is tied either: (a) by generally referring to LIBOR, or (b) because, when the disclosure is read in conjunction with the promissory note, the rate can be readily ascertained, is unavailing.  First, simply stating that the rate is "LIBOR" does not, "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."  15 U.S.C. § 1601(a).  If multiple banks were simply to disclose "LIBOR" as the index, it would be impossible for a borrower to ascertain the true terms of the credit and effectively

7

compare the loans simply by reference to the federal box.  One lender, for instance, might be referring to the three month LIBOR rate and another might be referring to the twelve month LIBOR rate.  The resulting disparity in the interest rate would not be apparent from the disclosure.

KeyBank's contention that the LIBOR rate is evident when the disclosure is examined in conjunction with the promissory note is similarly unpersuasive.  Simply put, the purpose of TILA is to require lenders to segregate (in a federal box) certain required disclosures from the substantial body of information often provided in connection with a loan.  This allows a borrower to readily ascertain certain key loan terms without scouring the promissory note in its entirety.  The Court agrees with plaintiff's contention that the Board's staff interpretation requires disclosure of the index within the federal box where, as here, there is a variable interest rate.  See 12 C.F.R. § 226.18(f)(1)(i), Supp. I, Official Staff Interpretation, Subpart C – Closed End Credit, ¶ 226.18(f)(1)(i)1 ("the circumstances under which the rate may increase *include identification of any index to which the rate is tied,* as well as any conditions or events on which the increase is contingent.").  Here, because KeyBank's rate is tied to an externally-defined index, the commentary unambiguously states that the index must be disclosed to the consumer.  Id. ("*An externally defined index, however, must be identified.*"); see also Milhollin, 444 U.S. at 565 ("Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive for several reasons.").  In the absence of a complete disclosure of the relevant LIBOR index, and given the Court's finding that such a disclosure must be made in the federal box, the Court rejects KeyBank's contention that, because the index was specifically identified within the promissory note, a TILA violation does not exist.

### 2.      KeyBank Cannot Claim Safe Harbor.

KeyBank's "safe harbor" argument also suffers from significant flaws.  For starters, KeyBank did not use the models it refers to and, therefore, cannot claim safe harbor.  In any event, KeyBank's assertion that three of the four Model Forms (that serve as examples of federal box disclosures) addressing variable rates found in the appendices to 12 C.F.R. §226 do not even mention an index is largely misguided.  Notably, Appendices H-3, H-4A, H4-B, and H4-C – the "model forms" that KeyBank claims do not refer to indices -- are not model *forms*, they are model *clauses*.  As discussed below, moreover, KeyBank has not included all of the relevant model forms in its analysis.

Even the most casual examination of the appendices to which KeyBank refers reveals that the clauses likely cannot stand alone as a complete "federal box," and omit many required disclosures.  For this reason alone, KeyBank's argument fails.  Though the use of a model clause could certainly support a safe harbor argument with respect to that clause, use of one clause would not immunize the remainder of a defective disclosure.  In short, the Court does not find that, because some of the model language does not refer to indices, a disclosure is not required.  Instead, the model clauses are examples of acceptable language to include in disclosures; they are not necessarily, in and of themselves, complete disclosures.

A closer examination of the clauses KeyBank relies upon reveals additional weaknesses in its argument.  KeyBank is correct that Appendices H-4A, H4-B, and H4-C address the variable-rate model clauses important to the issues at hand, but Form H-3, also mentioned by KeyBank, addresses the amount financed, and has no bearing on the issue.  Appendix H (Model Forms and Clauses) does list four groups of variable-rate model clauses.  Two, H-4(C) *and H-4(D)* (unmentioned by KeyBank), include references to an index.  Thus, half of the model clauses mention an index.  As

9

explained below, the two that fail to mention an index are likely inappropriate for the KeyBank loans at issue.  To determine the appropriateness of the model clauses, the Court turns to the Official Staff Interpretations found in Supplement I to Part 226 of the Code of Federal Regulations.

In the discussion of paragraph 18(f), which addresses variable rate disclosures, the commentary recites a number of "circumstances under which the rate may increase."  As noted above, the circumstances, "include identification of any index to which the rate is tied, as well as any conditions or events on which the rate is contingent."  12 C.F.R. §226, Supp. I, Official Staff Interpretation, Subpart C – Closed End Credit, ¶ 226.18(f)(1)(i)1.  Thus, the commentary appears unambiguous in its mandate that the index to which the rate is tied must be disclosed.  If the commentary instructs lenders to disclose the index to which the rate is tied, how can a reference to the index be absent from some of the "model clauses?"  A comparison of the complete commentary relevant to the four model clauses yields the answer.

The full text of the relevant commentary reads:

*Paragraph 18(f)(1)(i).*
1.  *Circumstances*.  The circumstances under which the rate may increase include identification of any index to which the rate is tied, as well as any conditions or events on which the increase is contingent.
  1.  When no specific index is used, any identifiable factors used to determine whether to increase the rate must be disclosed.
  2.  When the increase in the rate is purely discretionary, the fact that any increase is within the creditor's discretion must be disclosed.
  3.  When the index is internally defined (for example, by that creditor's prime rate), the creditor may comply with this requirement by either a brief description of that index or a statement that any increase is in the discretion of the creditor.  *An externally defined index, however, must be identified.*

Id. (emphasis added).  The first bullet addresses circumstances where no index can be disclosed because the rate increase is not tied to a specific index.  The comment, therefore, essentially instructs a lender to list any identifiable factors used to determine a rate increase.  In essence, a lender must

explain to a borrower why and how the loan's interest rate may change.

In addition to listing other required disclosures – rate caps and the effects of rate changes on payments (factors related to the effects of a rate change, not the reason for the rate change) – Model Clause H-4(A) addresses the need to list rate-related identifiable factors by suggesting the following language:

> The annual percentage rate may increase during the term of this transaction if:
> [the prime interest rate of (creditor) increases.]
> [the balance in your deposit account falls below $ _____.]
> [you terminate your employment with (employer)]

12 C.F.R. §226 App. H-4(A).  Thus, Model Clause H-4(A) (the first clause that KeyBank claims has no reference to an index) appears to offer suggestions for situations where: (a) as stated in the first bullet point of the commentary, a lender chooses *not to identify a specific inde*x (but chooses to adjust the rate based on other factors), or (b) as stated in the third bullet point in the commentary, where a lender indentifies an *internally defined* index (its own prime rate).  Because KeyBank used LIBOR – an externally defined index – it likely would have been inappropriate to use the model language found in H-4(A), because the borrowers rate changes in accordance with LIBOR and not due to a change in the borrower's condition (employment or account balance), or a fluctuation in an internally identified index (the bank's prime rate).  Instead, under the terms of KeyBank's loan to Blanco, the rate would change when an *externally* defined index – LIBOR – changed.  As noted above, it is clear that an externally defined index must be disclosed.  Id. ("*An externally defined index, however, must be identified.*").  Thus, while KeyBank is correct that model clause H-4(A) addresses variable rate loans, it does not appear to suggest terminology for variable interest rate loans that rely on externally defined indices.  KeyBank's reliance on Model Clause H-4(A), therefore, is

11

unavailing.

The second Model Clause, H-4(B), states: "Your loan contains a variable-rate feature. Disclosures about the variable-rate feature have been provided to you earlier." 12 C.F.R. §226 App. H-4(B).  Because KeyBank has not alleged that it provided borrowers with a variable-rate disclosure at an earlier time, the language suggested by Model Clause H-4(B) is wholly irrelevant to the issues at hand, and KeyBank's reliance on Model Clause H-4(B) as one of a supposed majority of Model Forms that omit reference to an index is misplaced.

The remaining two Model Clauses both *specifically include reference to indices upon which the rates will be based* and, do not support KeyBank's argument.  As a whole, therefore, KeyBank's suggestion that it should be entitled to safe harbor because it provided more detail than the four relevant model clauses lacks support in the regulations, the Board's commentary, or the model clauses themselves.

### B.    Plaintiff's Claim for Relief Under RISA.

In their second claim, plaintiffs argue that financial institutions are subject to the Ohio Retail Installment Sales Act, or RISA.  Specifically, plaintiffs argue that the defendants, despite their status as financial institutions, are subject to Ohio Revised Code section 1317.032(C).

### 1.    The Scope of RISA.

Defendants contend RISA specifically excludes transactions between financial institutions and their customers from its definition of "consumer transaction."  See Ohio Rev. Code § 1317.01(P).  In Turner v. Citywide Home Improvement, Inc., 2000 WL 262664 (Ohio Ct. App. 2d Dist. Mar. 11, 2000), however, an Ohio appellate court reversed the trial court's dismissal of a plaintiff's RISA claim.  The trial court held that financial institutions are exempt from RISA because

12

transactions between banks and their customers are specifically excluded from the definition of

"consumer transaction."  The court of appeals reversed, finding that:

> [RISA] exempts banks and financial institutions on the ground that *their* loans to
> *their* customers are not 'consumer transactions,' and that is correct.  But the transaction
> between the home improvement company in this case and the [plaintiff] was a "consumer
> transaction," and the portion of RISA quoted by the trial court . . . explicitly allows a
> buyer to assert against the holder of a purchase money loan installment note any defense
> or claim the buyer would have against, in this case, the home improvement company,
> since that transaction is a consumer transaction.

Id. at *3 (emphases in original).  Thus, in Turner, the court found that, under RISA, a consumer

could assert claims against the holder of a purchase money loan installment note, even if that holder

is a financial institution.

A "Purchase money loan installment note" is defined as:

> [A] cash advance that is received by a consumer from a creditor in return for
> a finance charge..., which is applied in whole or substantial part to a
> consumer transaction with a seller, who either:
> > (1) Cooperates with the creditor to channel consumers to the creditor
> > on a continuing basis;
> > (2) Is affiliated with the creditor by common control, contract, or
> > business arrangement.
> If a credit card issued by a bank or a savings and loan association is used by
> a consumer in a particular consumer transaction, the bank or savings and loan
> association is not a creditor, within the meaning of this division with respect
> to the particular consumer transaction.

Ohio Rev. Code § 1317.01(Q).  Here, plaintiff alleges that, "The Academy Schools were in

cooperation with KeyBank to channel the plaintiff and all those similarly situated to KeyBank on a

continuing basis and The Academy schools were affiliated with KeyBank by common control,

contract, or business arrangement."  Compl. at ¶ 40.  The allegations of the complaint, taken as a

whole, when coupled with the explanation of the loan process, provide support for the notion that

KeyBank and The Academy Schools were, at a minimum, affiliated by a business arrangement, and

13

the Court finds that, at this stage, plaintiff has sufficiently raised the possibility that the loans between KeyBank and students at The Academy Schools may constitute purchase-money loan installment notes for purposes of RISA.  See also Abel v. Keybank USA, N.A., No. 03 cv 524, slip. op., at 21 (N.D. Ohio Sep. 24, 2003) (finding same).

The section of the Ohio Revised Code that permits a consumer to assert various claims and defenses against the holder of a purchase-money installment note provides:

> A buyer, who has a defense against a seller arising out of a consumer transaction that he is entitled to assert as a defense against a holder, assignee, or transferee of a purchase money loan installment note or retail installment contract and as a cause of action against that seller, may assert the cause of action to recover from the holder, assignee, or transferee of the purchase money loan installment note or retail installment contract, the amount of any payments made to the holder, assignee, or transferee, if [certain conditions apply].

O.R.C. § 1317.032(C). [6]

In Abel, a sister court considered claims, similar to those alleged here, based on student loans received to attend a different, but also defunct, educational institution.  Abel, No. 03 cv 524 at 21. In analyzing the plaintiffs' RISA claims, the court found: "[RISA] Provisions 1317.031 and 1317.032 specifically permit a buyer who executes a purchase money loan installment note or a retail installment contract to assert certain defenses against 'any holder, assignee, or transferee of the note or contract.'"  The court further found that, "a financial institution that later obtains a retail installment contract or purchase money loan installment note may be subject to Sections 1317.031 and 1317.032."  Id.  Reasoning, "[t]o exclude financial institutions from liability would essentially render these provisions meaningless because it is unlikely that one retail seller will assign or transfer

---

[6] The defenses a buyer may assert under RISA include a claim that: "the subject of the consumer transaction was not furnished or delivered by the seller in accordance with the agreed upon terms of the transaction."

the note or contract to a nonfinancial institution." Id. (noting, "the statute specifies that *any* holder or recipient of the note or contract evidencing the indebtedness may be subjected to certain defenses the buyer has against the seller.").  After considering the relevant caselaw and examining the statutory provisions at issue, the Court agrees with the reasoning and holding of its sister court, and declines to hold that, under these circumstances, defendants' statuses as financial institutions precludes a finding of liability under RISA.

### 2.        The NBA

"Nearly two hundred years ago, in McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579 (1819), this Court held federal law supreme over state law with respect to national banking." Watters, 127 S.Ct. at 1566.  In 1864, Congress enacted the NBA which provides that nationally chartered banks shall have the power, "[t]o exercise ... all such incidental powers as shall be necessary to carry on the business of banking." Id. citing (12 U.S.C. § 24 Seventh).  At the present, "[b]usiness activities of national banks are controlled by the National Bank Act, 12 U.S.C. § 1 *et seq*., and regulations promulgated thereunder by the Office of the Comptroller of the Currency (OCC)," and, "'the States can exercise no control over [national banks], nor in any wise affect their operation, except in so far as Congress may see proper to permit.  Any thing beyond this is an abuse, because it is the usurpation of power which a single State cannot give.'" Id. at 1564, and 1567 (quoting Farmers' and Mechanics' Nat'l Bank v. Dearing, 91 U.S. 29, 34 (1875).

### 3.        Preemption Analysis Under the NBA.

"The Supremacy Clause invalidates state laws that interfere with or are contrary to federal law." Ass'n. of Banks in Insurance, Inc. v. Duryee, 270 F.3d 397, 403-04 (6th Cir. 2001).  Conflict preemption arises when "state law stands as an obstacle to the accomplishment and execution of the

15

full purposes and objectives of Congress."  Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 153 (1982) (internal citations omitted).  To the extent plaintiff contends there is a presumption against federal preemption here, the Supreme Court has, "'interpret[ed] grants of both enumerated and incidental "powers" to national banks as grants of authority not normally limited by, but rather ordinarily preempting, contrary state law.'"  Watters, 127 S.Ct. at 1567 (quoting Barnett Bank, of Marion Cty., N.A. v. Nelson, 517 U.S. 25, 32 (1996).  Thus, contrary to plaintiff's assertion, the "presumption [against preemption] disappears . . . in fields of regulation that have been substantially occupied by federal authority for an extended period of time."  Flagg v. Yonkers Sav. & Loan Ass'n, 396 F.3d 178, 183 (2d Cir. 2005).  Regulation of federally chartered banks is one such area.  Barnett Bank, 517 U.S. at 32-33.

In Watters, the Supreme Court recently explained: "[s]tates are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's exercise of its powers.  But when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way."  Id. "Beyond genuine dispute, state law . . . *may not curtail or hinder* a national bank's efficient exercise of any other power, incidental or enumerated under the NBA."  Id. at 1567-68 (emphasis added). "Security against significant interference by state regulators is a characteristic condition of the 'business of banking' conducted by national banks, and mortgage lending is one aspect of that business."  Id. at 1571.

Federal regulations enacted by federal agencies also have the authority to preempt state law. De la Cuesta, 458 U.S. at 153.  In the context of the NBA, the Office of the Comptroller of the Currency (the "OCC"), the agency charged with overseeing national banks has established rules, "to

16

provide greater certainty and clarity to national banks concerning the extent to which state laws governing deposit-taking, non-real-estate lending, and other authorized bank activities are applicable to national banks."  Bank Activities and Operation's Real Estate Lending and Appraisals, 68 Fed. Reg. 46119 (Aug. 5, 2003).  In 2004, the OCC provided further guidance by setting forth situations in which state laws are inapplicable to national banks: "[e]xcept where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its powers to conduct activities authorized under Federal law do not apply to national banks." 12 C.F.R. § 7.4009(b)); see id. § 7.4008(d).  These recently codified regulations apparently were drafted by the OCC in an effort to preempt conflicting state law in response to: "the trend at the state and local levels toward enacting legislation that seeks to impose costly and inconsistent compliance burdens on national banks."  Testimony of Julie L. Williams Before the Subcommittee on Oversight and Investigations of the Committee on Financial Services of the U.S. House of Representatives (January 28, 2004) (testimony of Julie L. Williams, First Senior Deputy Comptroller and Chief Counsel Office of the Comptroller of the Currency) ("Williams's Testimony").  In Watters, the Supreme Court examined one of the regulations relating to the regulation of operating subsidiaries within the States and found that it, "merely clarifies and confirms what the NBA already conveys: A national bank has the power to engage in . . . lending . . . that power cannot be significantly impaired or impeded by state law."  Watters, 127 S.Ct. 1572.  The Watters decision makes clear that the NBA and regulations promulgated by the OCC will preempt state law that "curtail[s] or hinder[s]" KeyBank's "efficient exercise of any . . . power, incidental or enumerated under the NBA."  Id. at 1567-68.  The Court, therefore, turns to the provisions of RISA in an effort to determine whether its application to KeyBank hinders KeyBank's powers under the NBA.

17

## 4.    The NBA Preempts RISA.

It is undisputed that, under the NBA, KeyBank has the power to negotiate promissory loans and to lend money.  The issue is whether incorporating the terms of RISA to the loans at issue here impermissibly "hinders" KeyBank's efficient exercise of that power.  For the reasons explained below, the Court finds that it does.

If plaintiff was correct in his assertion that the Ohio statutes apply to the loans at issue, then the part of RISA which he seeks to enforce, Ohio Revised Code section 1317.032, would read the Federal Trade Commission's (the "FTC") "Holder In Due Course Rule" into certain promissory notes negotiated between national banks and their customers.  Plaintiff, however, contends that the similarities between the FTC Holder Rule and the relevant provision of RISA support a finding that the RISA provisions are consistent with the goals of existing federal law and, therefore, present no conflict.  The Court disagrees for a number of reasons.

As an initial matter, the FTC has declined to require lenders to include the FTC Holder Rule in their contracts.  See Crisomia v. Parkway Mortgage, Inc., Nos. 00-35085DWS, 00-0938, 2001 WL 1403531, at (Bankr. E.D. Pa. Aug. 21, 2001) (discussing FTC's rejection of a regulation that would require lenders to include the FTC Holder Rule).  In Pratt v. North Dixie Manufactured Housing, Ltd., 20030WL 21040658, at *2 (Ohio App. 6th Dist. May 9, 2003), moreover, an Ohio plaintiff attempted to assert a claim for violation of the Ohio Consumer Sales Practices Act against a lender that financed the purchase of a mobile home.  The FTC Holder Rule, however, was not a term of the plaintiff's contract.  The Ohio court found that the lender could not be held liable because, "the contract [did] not contain the language provided in the FTC holder rule.  Without this language, [the lender] is not derivatively liable for any violation of the OSCPA."  See also Hanlin v. Ohio Builders

18

and Remodelers, Inc., 196 F.Supp.2d 572, 578 (S.D. Ohio 2001) (finding same); Vietnam Veterans of Am. v. Guerdon Indus., Inc., 644 F.Supp. 951, 964-65 (D. Del. 1986) (stating, "any rights of the consumer under the [FTC Holder Rule] come into existence only when the provision is in fact included in the consumer contract."); Crisomia, 2001 WL 1403531, *2 ("Even assuming that the FTC Holder Rule applies to student loan transactions, plaintiffs have no right against subsequent holders of the loans under federal law, if the required language is omitted.").  Thus, while the FTC Holder Rule and the relevant provisions of RISA are similar, RISA can apply even when it is excluded from an agreement whereas the FTC Holder Rule does not.  Plaintiff's suggested application of RISA, therefore, automatically would append FTC Holder Rule provisions to agreements between national banks and their customers, where Ohio common law and the FTC Holder Rule do not do so unless the provision expressly was included in the agreement.

As noted above, moreover, in Abel, the plaintiffs made claims virtually identical to those asserted here.  The Abel plaintiffs argued that that the closure of an educational institution enabled students who borrowed funds to attend those schools but did not complete their educations to assert a RISA claim against a nationally-chartered bank defendant.  Abel v. KeyBank USA, N.A., 313 F.Supp.2d 720 (N.D. Ohio 2004).  In holding that the NBA and its corresponding regulations preempted RISA, Judge Patricia A. Gaughan found:

> RISA provisions read into each promissory note (arising from a consumer transaction) a requirement that any holder, including a national bank, assume the liability of the seller under certain circumstances.  The Court finds that this type of state imposed liability significantly interferes with a national bankMBOL 61 \f"WP TypographicSymbols" \s 12s ability to negotiate promissory notes and lend money . . . .  Moreover, RISA will significantly impair the ability of the national bank to collect money on promissory notes that qualify for RISA protection.

19

Id. at 727.  The OCC, moreover, specifically addressed the potential conflict between state laws and the NBA by promulgating 12 C.F.R. section 7.4008, which provides that: "[a] national bank may make non-real estate loans without regard to state law limitations concerning: . . . the terms of credit."  12 C.F.R. section 7.4008(d)(2)(iv).

The Court agrees with Judge Gaughan's finding that imposing liability under RISA would interfere with KeyBank's ability to negotiate promissory notes and lend money.  Ohio Revised Code section 1317.032 requires national banks to account for the poor performance of unrelated parties by subjecting them to defenses to repayment based not upon their own actions, but upon the failures of others.  National banks operating in Ohio would have to account for those myriad risks in pricing loans originating in Ohio (at a minimum), and further consider those risks when they aggregate those loans for resale to other banks throughout the nation.  In short, the Court agrees that RISA will "undoubtedly have a significant impact on the value of promissory notes issued in Ohio because such notes will likely be worth less than similar notes issued in states that do not impose RISA type liability."  Abel, 313 F.Supp.2d at 727.  As a result, the Court finds that the provisions of Ohio's Retail Installment Sales Act cannot be appended to promissory notes issued by nationally chartered banks because to do so would impermissibly hinder the efficient exercise of the powers provided to nationally-chartered banks under the NBA.  Accordingly, the Court finds that plaintiff's RISA-based claim must be dismissed as preempted.

## IV.    PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Having decided that plaintiff's RISA claim is preempted, the Court need not reach the class certification issues with respect to that count.  Sprague v. General Motors Corp., 133 F.3d 388, 397

(6th Cir. 1998) (en banc) *cert. denied*, 524 U.S. 923 (1998) (finding that, "plaintiffs have no basis for complaining of a refusal to certify a proposed class where the representatives of the class cannot prevail on the merits . . . .").  As discussed above, however, plaintiff's TILA claim has survived defendants' motion to dismiss and, therefore, the Court undertakes the class certification analysis with respect to that claim alone.

At the outset, the Court observes that the defendants have essentially conceded that the plaintiff's TILA claims satisfy the prerequisites of Rule 23(a).  Indeed, defendants' twenty-page memorandum in opposition to plaintiff's motion for class certification devotes only two pages to the TILA class at all.  That brief argument focuses only on whether the TILA class would be a superior method of adjudication – an issue addressed below, in the context of Rule 23(b).  Nevertheless, the Court "may not certify any class without 'rigorous analysis' of the requirements of Rule 23" Id. (citing General Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982)), and "[n]o class that fails to satisfy all four of the prerequisites of Rule 23(a) may be certified, and each class meeting those prerequisites must also pass at least one of the tests set forth in Rule 23(b)." Id. (citations omitted).

Federal Rule of Civil Procedure 23 governs federal class certification proceedings.  Plaintiff has the burden of proving that all of the requirements of Rule 23 are met.  Amchem Prods. v. Windsor, 521 U.S. 591, 614 (1997).  Prior to certifying a class, the district court must conduct a "rigorous analysis" of the requirements of Rule 23.  Sprague, 133 F.3d at 397.  When doing so, a court should accept the governing complaint's allegations as true.  Reeb v. Ohio Dept. Of Rehab. & Correction, 81 Fed. Appx. 550, 555 (6th Cir. 2003).  "Ordinarily, a district court must determine the permissibility of class certification based upon information other than that which is in the pleadings although it may do so based on the pleadings alone where they set forth sufficient facts."

21

Id.  "In making such a determination, a district court may draw reasonable inferences from the facts before it."  Id. (citing Senter v. Gen. Motors Corp., 532 F.2d 511, 520 (6th Cir. 1976)).

Typically, a court does conduct a preliminary inquiry into the underlying merits of a suit to determine whether it may be maintained as a class action.  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974).  The Supreme Court has recognized, however, that many issues that arise in a Rule 23 analysis may be intimately involved with the merits of some claims – the more complex the determinations, the more likely they are entangled with merits-based inquiries.  Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 n. 12 (1978); see also In re Initial Public Offerings Securities Litigation, 471 F.3d 24, 34-35 (2d Cir. 2006) (explaining that Eisen's directive that courts not consider the merits has sometimes been taken out of context).  Here, however, given the relative simplicity of the issues presented by plaintiff's TILA claims, there is little cause to delve into their underlying merits.

### A.      Rule 23(a).

Under Rule 23(a), the Court must find that plaintiff has shown that the putative class satisfies four prerequisites for certification.  Rule 23(a) provides:

> (a)      **Prerequisites.**  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1)      the class is so *numerous* that joinder of all members is impracticable;
>
> (2)      there are questions of law or fact *common* to the class;
>
> (3)      the claims or defenses of the representative parties are *typical* of the claims or defenses of the class; and

22

> (4)     the representative parties will fairly and *adequately*
> protect the interests of the class.

Fed. R. Civ. P. 23(a) (emphases added).  These prerequisites traditionally are referred to as

numerosity, commonality, typicality, and adequacy of representation.

**B.**     **Rule 23(b).**

To succeed on a motion for class certification, plaintiff also must satisfy at least one of Rule

23(b)'s provisions.  In re American Medical Sys., 75 F.3d 1069, 1079 (6th Cir. 1996).  Here,

Plaintiffs argue that certification of the TILA class is appropriate under 23(b)(3).  Rule 23(b)(3)

reads:

> (b)     **Types of Class Actions.**  A class action may be maintained
> if Rule 23(a) is satisfied and if:
>
>                          \*  \*  \*
>
> (3)     the court finds that the questions of law or fact
> common to the class members *predominate*
> over any questions affecting only individual
> members, and that a class action is *superior*
> to other available methods for fairly and
> efficiently adjudicating the controversy.  The
> matters pertinent to these findings include:
>
>     (A)     the class members' interests in individually
> controlling the prosecution or
> defense of separate actions;
>
>     (B)     the extent and nature of any litigation
> concerning the controversy already
> begun by or against class members;
>
>     (C)     the desirability or undesirability of
> concentrating the litigation of the
> claim in the particular forum; and

23

(D)      the likely difficulties in managing a class
action.

Fed. R. Civ. P. 23(b) (emphases added).  Thus, plaintiff must demonstrate two things to satisfy

Rule 23(b)(3): (1) that common questions of law or fact predominate over individual questions

and (2) that a class action is a superior method of addressing the claims at issue.  These

requirements are routinely referred to as predominance and superiority.

### C.    Discussion.

#### 1.    Rule 23(a).

The Court only briefly addresses the prerequisites under Rule 23(a) because the filings in this

matter have made clear that the existence of those prerequisites is largely undisputed.

#### (a)    Numerosity.

In their complaint, Plaintiffs claim that, although the exact number of class members is

unknown, there are in excess of a hundred former students who are potential class members.

(Compl. ¶ 18.)  In their motion for class certification, plaintiff provides greater specificity, stating

that there are as many as 268 student-borrowers.  (Doc. 111, at 5.)  The defendants have not disputed

these numbers.  "While not an absolute rule, it is generally accepted that a class of 40 or more

members is sufficient to establish numerosity."  Appoloni v. United States, 218 F.R.D. 556, 561

(W.D. Mich. 2003) (citing Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d

Cir.1995); 1 Newberg On Class Actions, 2d, § 3.05 (1985 ed.)).  Here, the putative class could

exceed many times that amount, making joinder of individual plaintiffs impractical.  Thus, the Court

finds that the plaintiff has satisfied the "numerosity" prerequisite.

(b)     **Commonality.**

Commonality requires, "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The commonality test, "is qualitative rather than quantitative [;] that is, there need be only a single issue common to all members of the class."  In re American Medical Sys., 75 F.3d 1069, 1080 (6th Cir. 1996); Sprague, 133 F.3d at 397.  Thus, although individual questions of law and fact may exist among putative class members, those individualized questions do not necessarily defeat a showing of commonality.  See Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1196–97 (6th Cir. 1988); Senter v. General Motors Corp., 532 F.2d 511, 523–24 (6th Cir. 1976), *cert. denied*, 429 U.S. 870 (1976).  The Court must be mindful, however, of the purpose underlying the commonality requirement – that "the class-action device save[] the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23."  Califano v. Yamasaki, 442 U.S. 682, 701 (1979).  Thus, if questions of law or fact common to all of the class members are far outweighed by differences among the class, then a class should not be certified.

Plaintiff argues that there is commonality as to both legal and factual questions in this case.  In sum, plaintiff's TILA claims are based on KeyBank's alleged "uniform failure to disclose the index applicable to the variable interest rate" of the relevant loans.  (Doc. 111, at 9.)  Thus, there are key questions common to all TILA class members: (1) whether the disclosure supplied by KeyBank in connection with their loan omitted the variable interest rate – a key factual determination; and (2) whether the alleged deficiencies in the disclosures are sufficient to subject KeyBank to liability under TILA – the critical question of law.  In their opposition, Keybank does not suggest that commonality is lacking among the putative class.  Accordingly, and despite the limited allegations and briefing

25

on the issue, the Court concludes that the preceding two questions are common to the class and crucial to the resolution of their claims and, therefore, that the plaintiff has carried their burden with respect to the commonality question.

### (c)    Typicality.

Under Federal Rule of Civil Procedure 23(a)(3), a claim is typical if, "it arises from the same event or practice, or course of conduct, that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." Am. Med. Sys., Inc., 75 F.3d, at 1082. "Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." Sprague, 133 F.3d at 399. The typicality requirement is not satisfied if a plaintiff can prove his own claim but not "necessarily have proved anybody else's claim." Id. For the district court to conclude that the typicality requirement is satisfied, "a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." Senter, 532 F.2d at 525 n. 31.

Here, the claims of Ramon Blanco, the putative class representative, are virtually indistinguishable from the TILA claims of the putative class. It is true that Blanco only attended one of the Academy schools that allegedly offered student loans via a program with KeyBank. The complaint, however, alleges that, though Blanco attended the Academy of Weston, the loan forms were used at all Academy schools. Indeed, the complaint alleges that his promissory note (and all others) listed the education institution as the Academy of South Florida, Inc. (an approved, eligible institution, but one that Blanco did not attend) and also made payment to the Academy of South Florida, Inc. At this juncture, therefore, it is reasonable to infer that the loan programs for all

26

Academy schools fell under the umbrella of the Academy of South Florida, Inc., and used the same loan documents.[7]  As yet, the Defendants have made no effort to demonstrate that the loan programs at the various Academy schools varied significantly or to refute the allegations of the complaint. Furthermore, given the simplicity of the TILA claims, it seems unlikely that significant differences will arise between the claims of Blanco and those of the putative TILA class.[8]  For the foregoing reasons, therefore, the Court finds that the plaintiff has demonstrated that his claims are typical of the claims of the putative class.

### (d)    Adequacy.

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  Amchem Prod., Inc. v. Windsor, 521 U.S. 591 (1997) (citations omitted).  "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  Id.  Courts "review[] the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation . . . ."  Stout v. J.D. Byrider, 228 F.3d 709, 717 (6th Cir. 2000).  Here, therefore, the "adequacy" prerequisite is directed toward Ramon Blanco and his counsel.

According to the briefing, Ramon Blanco understands his duties as class representative, and

---

[7] Stated differently, the inference is that KeyBank certified The Academy of South Florida, Inc. as an approved institution, and set up a loan program to cover all the academy subsidiaries (The Academy of Weston, Inc., The Academy of West Palm Beach, Inc., The Academy of Ft. Lauderdale, Inc., The Academy of Tampa, Inc., and The Academy of Kendall, Inc.,) under a single loan program with the parent corporation.

[8] At the risk of oversimplifying the TILA claims, it seems as though the primary issues are only whether the plaintiffs received an incomplete disclosure and whether the disclosure was deficient under TILA.  The TILA claims, therefore, unlike the RISA claims, do not require an in-depth examination of, for instance, whether, and to what extent, the Plaintiffs' received the benefit of their education.

27

he is willing and able to fulfill his obligations.  Plaintiff's counsel, moreover, have supplied the Court with affidavits detailing their experience in consumer-related class actions.  The Court has no information or argument that contradicts these statements or qualifications, and Defendants have not contested the adequacy of class representation.  Accordingly, the Court finds that, with respect to representation of the proposed class, Rule 23(a)(4) is satisfied.

### 2.  Rule 23(b).

In addition to the prerequisites of Rule 23(a), Rule 23(b) requires: (1) that questions common to the class predominate over questions affecting only individual members; and (2) that class resolution is superior to alternative methods for adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  "Put differently, the proposed class must be, "sufficiently cohesive to warrant adjudication by representation."  In re Scrap Metal Antitrust Litigation, --- F.3d ----, 2008 WL 2050820, *13 (6th Cir. May 15, 2008) (citing Amchem, 521 U.S. at 623).

### (a).  Predominance.

To satisfy the predominance requirement of Rule 23(b)(3), "a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof."  Beattie v. CenturyTel, Inc., 511 F.3d 554, 564 (6th Cir. 2007) (citations omitted).  "Further, the fact that a defense 'may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones."  Id. (citations omitted)  "Lastly, common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."  Id. (citations omitted).

In their motion for class certification, plaintiff contends that, particularly with respect to the

TILA class, common questions predominate over individual inquiries.  Indeed, here the pivotal inquires revolve around standard form documents.  Thus, according to plaintiff, either the defendants documents violated TILA (by failing to make required disclosures) or they did not.  Indeed, courts have recognized that, when standard form documents are central to the issues of the matter, common issues often predominate.  See, e.g., Abel v. Keybank USA, N.A., No. 03 CV 524, Slip op., 2004 WL 540699, at *8 (N.D. Ohio Mar. 4, 2004); In re CommonPoint Mortgage Co., 283 B.R. 469, 478 (Bkrtcy. W.D.Mich. 2002) ("Indeed, common questions of law or fact are particularly likely to predominate in cases which derive from form documents and standardized procedures."); Gradisher v. Check Enforcement Unit, Inc., 203 F.R.D. 271 (W.D. Mich. 2001); Mayo v. Sears Roebuck & Co., 148 F.R.D. 576 (S.D. Ohio 1993).  Plaintiff further argues that, given the strict-liability nature of TILA, and the statutory damages available, individualized inquiries into reliance, causation, and damages (common pitfalls to class actions) are wholly unnecessary.  The defendants offer no rebuttal to plaintiff's assertion that common issues predominate.  After reviewing the allegations and briefing on the issue, the Court finds that the common issues described above are likely to predominate over issues that may require individualized proof.

### (b).  Superiority.

In finding that a class action is a superior method of adjudicating a controversy, the Court must balance the fairness and efficiency of the class action against, among other things, alternative forms such as individual lawsuits, consolidation or proceedings before a governing administrative body.  Rule 23(b)(3) identifies a variety of factors the Court should consider:

(1)    class members' interests in individually controlling the prosecution or defense of separate actions;

29

(2)     extent and nature of any litigation concerning the controversy already begun by or against class members;

(3)     desirability or undesirability of concentrating the litigation of claims in a particular forum; and

(4)     likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

In their opposition, defendants claim that some of the potential claimants are in default of their loans and may be opposed to asserting TILA claims in the face of potential default-related counterclaims.  Citing Heaven v. Trust Co. Bank, 118 F.3d 735, 738 (11th Cir. 1997), defendants claim that, where compulsory counterclaims exist, individuals may be better off controlling their own lawsuits.  In Maddox v. Kentucky Fin. Co., Inc., 736 F.2d 380 (6th Cir. 1984), however, the Sixth Circuit found debt counterclaims in a TILA context to be permissive, rather than compulsory. Id. at 383 ("It is not clear that the interests of judicial economy and efficiency would be served in the least by requiring the two claims be heard together.").  Even if the counterclaims were compulsory, they would not necessarily defeat class certification, particularly where, as here, they are undetermined and speculative in nature.  See Gilkey v. Central Clearing Co., 202 F.R.D. 515, 529 (E.D. Mich. 2001) ("Defendants have failed to do anything more than raise the potential for compulsory counterclaims.  While it is certainly likely that some class members have defaulted, Defendants do not provide any basis for the Court to estimate how many."); id. (citing. Roper v. Consurve, Inc., 578 F.2d 1106, 1112 (5th Cir.1978)).  Given the undeveloped nature of the counterclaims, and because they are, at best, permissive counterclaims (and, indeed, potentially claims over which the Court does not possess jurisdiction), the Court declines to deny certification based on the possibility that defendants will attempt to assert collection-related claims against some

30

of the plaintiffs.

The defendants also briefly suggest that KeyBank may be able to avoid liability if it can demonstrate that the disclosures were distributed simultaneously with another writing which clearly contained the necessary information.  Defendants, however, have made no effort to present evidence showing whether such documents actually were presented simultaneously, were supposed to be presented simultaneously, or whether there were policies or instructions in place designed to effect a simultaneous presentation.  See Abel, 2004 WL 540699, at *16-*17 (rejecting same).  It is unclear at this stage, moreover, whether the defendants would be able to avoid liability even if the documents were presented simultaneously.  Accordingly, the Court declines to find that this issue would render class treatment an inferior means of adjudicating the claims.

Finally, citing to Shroder v. Suburban Coastal Corp., 729, F.2d 1371 (11th Cir. 1984), which relies on Watkins v. Simmons & Clark, Inc., 618 F.2d 398 (6th Cir. 1980), defendants suggest that class treatment may not be appropriate for technical violations of TILA.  The defendants raised this same argument before Judge Gaughan in Abel, but cited to Watkins directly.  After reviewing the cases, the Court agrees with Judge Gaughan's interpretation that, "far from suggesting that class action treatment is inappropriate for technical TILA violations, Watkins implies that a class action may very well be a superior method for adjudicating these types of claims." Abel, 2004 WL 540699, at *16 (citing Watkins, 618 F.2d at 403-04 ("class certification should be denied only in a case involving technical violations and only where the district court, in the exercise of discretion, believes that certification is unwarranted.").)  In short, the Court rejects defendants' suggestion that certification of a class alleging a "technical" violations of TILA is disfavored.  See Watkins, 618 F.2d at 404 (stating: "[w]ere the certification issue before us de novo we may very well have certified

31

the class.")

## V.    CONCLUSION

For the reasons explained above, the defendants' Motion to Dismiss (Doc. 104) is

**GRANTED** in part and **DENIED** in part.  Plaintiffs' *Amended Motion for Class Certification* (Doc.

111) is **GRANTED** in part and **DENIED** in part.  The Court will hold a **STATUS CONFERENCE**

in this matter on Friday, July 11, 2008 at 12:00 p.m.


**IT IS SO ORDERED.**



s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**

**Dated:  June 30, 2008**